*NOT FOR PUBLICATION*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

_____
                                    :

**JULIO REPETTO**,                     :
                                    :
          Plaintiff,            :
                                    :       Civ. Action No.: 16-1399 (FLW)
v.                                  :
                                    :              **OPINION**
**CAROLYN W. COLVIN, ACTING**    :
**COMMISSIONER OF SOCIAL**      :
**SECURITY**,                      :
                                    :
          Defendant.         :
_____:

**WOLFSON, United States District Judge:**

       Julio Repetto ("Plaintiff") appeals from the final decision of the Acting Commissioner of Social Security, Carolyn W. Colvin ("Defendant" or "Commissioner"), who denied Plaintiff disability insurance benefits ("DIB") under Title II of the Social Security (the "Act"). After reviewing the administrative record ("A.R."), the Court finds that the Administrative Law Judge's ("ALJ") determinations were based on substantial evidence and, accordingly, affirms the decision.

**I.      FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

       Plaintiff was born on November 8, 1966, and was 44 years old on his alleged disability onset date of October 17, 2011. On January 10, 2013, Plaintiff filed an application for DIB based on knee and hip injuries. That application was denied, and Plaintiff requested reconsideration, which was also denied. Plaintiff appealed and requested a hearing before an ALJ. On August 1, 2014, a hearing was held before ALJ Jack Russak. On October 1, 2014, the

1

ALJ issued a written opinion, finding that Plaintiff was not disabled.  Plaintiff appealed that decision to the Appeals Council, which denied his request for review.  Having exhausted his administrative remedies, Plaintiff filed his Complaint in the instant action.

**a.     Work Activity and Function Reports**

Although Plaintiff did not complete high school, he obtained a General Educational Development ("GED") certificate in December 1988.  See A.R. at 42.  In his work history report, Plaintiff stated that he began working as a police officer in the New York City Police Department ("NYPD") in June 1992.  Id. at 149.  After injuring his left knee on October 17, 2011, Plaintiff explained that he was "placed on limited duty" and his hours were reduced.   Id. at 151-152.  Approximately one year after his knee injury, on October 30, 2012, Plaintiff stopped working for the NYPD.[1]  Id. at 149.

In his function report, Plaintiff stated that he lives with his family on Staten Island, New York.  Id. at 195.  Plaintiff explained that he prepares his own food, but he only "prepare[s] meals that do not require extensive standing, or [he] use[s] [a] stool to prepare food."  Id. at 196.  Plaintiff performs household chores, including "[p]icking up after [his] dogs [with the] assistance of scooper [and] [he] can use [a] hose if [he] sits often."  Id. at 197.  Plaintiff clarified that he is "unable to do yard work because it requires [him] to extensively use [his] knees."  Id.  In addition, Plaintiff stated that is able to drive and shop for food, but "any other shopping is done by [his] wife while [he] waits in [the] car."  Id. at 197-98.

---

[1] Plaintiff was awarded disability retirement benefits from the NYPD; the Medical Board Police Pension Fund found that "[Plaintiff] is disabled from performing the full duties of a New York City Police Officer" because of his knee injury and related ailments.  Id. at 249-54, 513-18.

Plaintiff reported that it is "somewhat difficult" to sit and "difficult" to lift, stand and climb stairs.  Id. at 200.  Plaintiff further reported that it is "very difficult [to walk] without pain medication" and "impossible" to either kneel or squat.  Id.

**b.**      **Review of the Objective Medical Evidence**

On October 17, 2011, Plaintiff was taken to Staten Island University Hospital to treat his knee injury.  Id. at 301-08, 669-712.  Several days later, on October 24, 2011, Plaintiff visited Charles DeMarco ("Dr. DeMarco"), an orthopedic surgeon, for an initial evaluation.  Id. at 298. In his report, Dr. DeMarco noted that Plaintiff had "stepped out of his [police] vehicle and twisted his leg on a rock and sustained a twisting injury and hyperextended injury to his left knee."  Id.  Plaintiff reported "having pain, clicking, popping and buckling in [his] left knee."  Id. Dr. DeMarco found that Plaintiff was experiencing swelling and tenderness, and an MRI showed an osteochondral fracture, an osteochondral defect, a medial collateral ligament sprain, a torn meniscus and a subchondral fracture.  Id.  Dr. DeMarco advised Plaintiff that "he may eventually require surgical intervention."  Id.

On October 31, 2011, Plaintiff returned to Dr. DeMarco for a follow-up evaluation.  Id. at 295.  Plaintiff explained that he was still suffering from knee pain.  Id.  Dr. DeMarco recommended that Plaintiff obtain a second opinion from Steven Touliopoulos ("Dr. Touliopoulos"), another orthopedic surgeon.  Id.  On November 7, 2011, Dr. DeMarco saw Plaintiff, who complained of "pain and dysfunction in the left knee… [that is] worse with any prolonged walking, prolonged standing, heavy lifting, or ascending or descending stairs."  Id. at 291.  Dr. DeMarco explained to Plaintiff that "he may be a candidate for arthroscopy, meniscectomy, debridement, and possible anterior cruciate ligament reconstruction based on level of degenerative arthritis."  Id.  While Dr. DeMarco advised Plaintiff that "[he] must let his

MCL heal before proceeding with surgical intervention," the doctor instructed Plaintiff to immediately "start a course of physical therapy with stretching, strengthen, and range of motion exercises." Id.

On December 6, 2011, Plaintiff visited Dr. Touliopoulos, who opined that "[Plaintiff] has decreased activity of daily living, [and is] able to walk only about five blocks before having to stop for pain," but "[he] is taking Percocet with mild relief." Id. at 285. Dr. Touliopoulos noted that an "MRI revealed medial meniscus tear, grade II tear of the medial collateral ligament, and large joint effusion and grade IV chondral damage of the medial compartment as well as the lateral patellar facet." Id. Dr. Touliopoulos determined that Plaintiff should undergo left knee arthroscopic surgery, and the doctor informed Plaintiff that he will likely require a total knee replacement "in the not so distant future." Id. at 285-86.

On January 2, 2012, Dr. DeMarco saw Plaintiff and determined that "[he] needs to have [the surgery] done as soon as possible," and Dr. DeMarco noted that "[Plaintiff] understands he eventually may require knee replacement down the road." Id. at 284. On January 13, 2012, Dr. DeMarco performed knee surgery on Plaintiff with the assistance of Dr. Touliopoulos. Id. at 279-80. Later that same month, on January 23, 2012, Plaintiff visited Dr. DeMarco for a post-operative examination. Id. at 278. Dr. DeMarco noted that, "[d]ue to his post traumatic arthritis, [Plaintiff] was not a candidate for ligamentation reconstruction," and "[he] was told to continue protected weight bearing, physical therapy with active and active-assisted range of motion exercises." Id.

The following week, Plaintiff had his sutures removed, and Dr. DeMarco advised Plaintiff to "[c]ontinue course of physical therapy." Id. at 277. On February 28, 2012, Dr. DeMarco told Plaintiff that he "will eventually require knee replacement surgery" and

recommended that Plaintiff should "start some gentle walking to keep his weight down and allow motion to allow healing of his cartilage." Id. at 276. Dr. DeMarco also informed Plaintiff that he was allowed to do "full weight bearing" activities at physical therapy. Id.

On April 24, 2012, Dr. DeMarco recommended that Plaintiff should continue with some gentle walking, but concluded that "[he] will not be able to return to work as a New York City police officer." Id. at 273. On May 29, 2012, Dr. DeMarco again stated that Plaintiff will most likely need a knee replacement surgery "down the road." Id. at 271. On June 18, 2012, Dr. DeMarco reported that "[Plaintiff] still has pain and dysfunction," and that he has "significant damage" in his left knee. Id. at 270. In his September 24, 2012 and November 12, 2012 reports, Dr. DeMarco remarked that "[w]e will continue course of conservative management." Id. at 548, 550.

From January to July 2012, Plaintiff attended physical therapy. Id. at 311-75. On July 5, 2012, Carla Buonviaggio ("Buonviaggio"), a physical therapist, wrote a letter stating that she had treated Plaintiff following his surgery on January 13, 2012. Id. at 311. According to Buonviaggio, "[Plaintiff's] knee range of motion remains painful at end ranges... [and] [he] is unable to perform a single leg stance with full knee extension," which "means his knee is always bent, making it slightly unstable." Id. She also noted some atrophy in the left quadriceps. Id. Buonviaggio stated that Plaintiff complains of "pain with walking, standing, and stairs, and the inability to walk without a limp. He is still unable to run or jog at this time secondary to pain. He is unable to squat without pain." Id. Buonviaggio reported that "[Plaintiff] has been receiving extensive physical therapy for over 6 months," but she thinks that "he has reached his maximal therapeutic potential" and is disabled "both clinically and functionally." Id.

On January 7, 2013, Plaintiff saw Dr. DeMarco complaining about "pain, clicking, and popping in the left hip," which prompted Dr. DeMarco to request an MRI and x-ray. Id. at 549. On February 15, 2013, Plaintiff had an x-ray of his hip, which revealed "[n]o acute fracture of dislocation" and "[j]oint space and articular surfaces are maintained." Id. at 544. On February 23, 2013, an MRI of the hip revealed acetabular dysplasia, a diffuse superior labral tear, a posterior labral tear, an anterior sublabral erosion and bilateral hamstring tears. Id. at 545-46.

With respect to his sleeping problems, Plaintiff underwent a sleep study on January 30, 2013, and was diagnosed with "severe obstructive sleep apnea syndrome. Id. at 500-01. Plaintiff was instructed to "undergo an aggressive course of weight loss," as well as "refrain from driving and other such activities until excessive daytime somnolence has been corrected." Id. at 501. Plaintiff was prescribed CPAP therapy. Id.

In July 2013, testing revealed that Plaintiff had developed a cancerous renal mass on his kidney. Id. at 732-43. On August 20, 2013, Simon Saada ("Dr. Saada"), M.D., performed surgery on Plaintiff to remove the renal carcinoma through a rib resection. Id. at 732-34. Fortunately, the cancer was limited to his kidney. Id. at 739-40. On July 24, 2014, Dr. Saada completed a medical report for the Social Security agency in which he stated that "I cannot provide a medical opinion regarding [Plaintiff's] ability to do work-related activities." Id. at 753. However, Dr. Saada reported that Plaintiff did not have any limitations in connection with standing or walking, but indicated that Plaintiff can only occasionally lift five pounds. Id. at 752.

Sujit Chakrabarti ("Dr. Chakrabarti"), M.D., examined Plaintiff twice on behalf of the Social Security agency. During the first examination, on May 8, 2013, Dr. Chakrabarti reported that Plaintiff complained of knee and hip pain. Id. at 714-15. Dr. Chakrabarti also reported that "[Plaintiff] claims that he can stand for about 10 minutes without significant problems," and that

"[h]e can sit for about 30-45 minutes without any significant problem, and can walk about 4-5 blocks." Id. at 715-16. Dr. Chakrabarti noted that "[Plaintiff] walks in a heel-toe [motion], [with a] minimal limp favoring the right side." Id. at 716. Dr. Chakrabarti only reported a ten degree difference in his Plaintiff's ability to flex both his right and left knees. Id.

During the second examination, on July 12, 2014, Dr. Chakrabarti noted that "[Plaintiff] claims his left knee buckles," and that "[h]e has constant, annoying pain aggravated by activity and walking." Id. at 720. In addition, Plaintiff reported that "[h]e can stand between 10 to 15 minutes and sitting 20 minutes to ½ hour," and "[h]e can walk about 3 to 4 blocks without any problems and will be able to carry about 10 pounds of weight." Id. at 721. Dr. Chakrabarti noted that Plaintiff was still "grossly overweight" at 290 pounds. Id.

Dr. Chakrabarti also completed a Medical Source Statement opining that Plaintiff can frequently lift up to ten pounds, and he can occasionally carry up to ten pounds. Id. at 725. According to Dr. Chakrabarti, Plaintiff can sit for thirty minutes up to four hours a day; stand for fifteen minutes up to two hours a day; and, walk for twenty minutes up to two hours a day. Id. at 725-26. Dr. Chakrabarti determined Plaintiff can also occasionally climb stairs and crouch, but he can never climb ladders or scaffolds, balance, stoop, kneel and crawl. Id. at 728. In addition, Dr. Chakrabarti opined that Plaintiff can occasionally operate a vehicle, but he can never interact with unprotected heights or moving mechanical parts. Id. at 729. It was also suggested that Plaintiff could occasionally be exposed to humidity and wetness, pulmonary irritants, extreme heat and vibrations. Id.

**c.** **Review of the Testimonial Record**

**1.** **Plaintiff's Testimony**

At his hearing, Plaintiff testified that he was 5'11" and weighed 290 pounds, and that he suffers from several ailments. Id. at 38. Plaintiff first stated that, while he was working as a police officer, he injured his knee stepping out of his police car. Id. at 39. Plaintiff explained that, after his knee injury, he started experiencing hip problems because of his limp. Id. at 45. Plaintiff also testified that he had surgery to remove a renal mass located on his kidney, which was malignant. Id. at 38. Because the mass was "isolated to the kidney," Plaintiff was not required to undergo chemotherapy or radiation treatment. Id. at 38. However, when his kidney was removed, Dr. Saada was required to make a ten inch incision "through [] a thick portion of muscle" on his stomach, and, as a result, "[Plaintiff's] entire side is numb" and he is at an increased risk of sustaining a hernia. Id. at 48-49. Plaintiff testified that he also suffers from asthma and gastroesophageal reflux disease. Id. at 43-44.

With respect to his daily activities, Plaintiff stated that he and his wife normally have breakfast together, and then Plaintiff will "drive [his] wife so she can do [errands]." Id. at 47. Indeed, Plaintiff stated that he drives "[o]n a daily basis," and that he only experiences pain in his left leg after "extensive driving," which is ameliorated by stretching. Id. at 40-41. Once the daily errands are completed, Plaintiff testified that he spends the rest of the day at his house. Id. at 47. Plaintiff enjoys cooking and performs some housework, including light cleaning and bringing out the garbage. Id. at 46-47. Plaintiff also uses a smartphone and computer for checking his Facebook and email accounts. Id. at 41. In regard to his social activities, Plaintiff stated that he "flew to St. Martin" for a vacation with his family. Id. at 42.

Plaintiff testified that "the physical pain is constant" in his left knee and right hip, but "[i]t just gets aggravated by walking and sitting." Id. at 45. Plaintiff specifically stated that he "can walk three or four blocks before the pain become almost unbearable, where [he would] have

to stop." Id.  Plaintiff claimed that he can only "stand [for] ten minutes" and "sit [for] 25

minutes, half an hour before the pain… radiates from my rear down to my ankle." Id. at 46.

Despite the pain from both walking and sitting, Plaintiff testified that he no longer goes to a

physical therapist, nor does he use a cane.  Id. at 40.  Additionally, Plaintiff does not have a

problem showering, and he is he is able to climb the stairs with the help of a hand rail, but he has

some "difficulty with [putting on] long pants and socks at times." Id. at 40.  Plaintiff stated that

he does not go to the gym and he smokes "20 cigarettes a day." Id. at 40, 42.

### 2. Vocational Expert's Testimony

Jackie Wilson ("Wilson"), a vocational expert, also testified before the ALJ.  Id. at 49-54.

At the hearing, the ALJ asked Wilson to assume a hypothetical individual who is able to perform

sedentary work, but had the following limitations:

> I'm going to add a sit/stand option, allowing this person to sit or stand alternately
> at will, provided this person is not off task more than five percent of the work
> period.  For postural limitations.  Climb ramps and stairs occasionally.  Never
> climb ladders, ropes, scaffolds.  Occasionally stop, crouch, kneel, [and] never
> crawl.  There would be no exposure to moving machinery, unprotected heights, or
> driving vehicles.  In addition, for environmental limitations, avoid… extreme
> heat, wetness, humidity, irritants such as fumes, odors, dust gases, poorly
> ventilated areas and chemicals.

Id. at 51.  In response, Wilson testified that Plaintiff could not perform his past work as a police

officer.  Id. at 50-51.  However, Wilson concluded that Plaintiff could perform the following jobs

that exist in significant numbers in the national economy: (i) Order Clerk, Dictionary of

Occupational Titles ("DOT") Code 209.567-014; (ii) Ampoule Sealer, DOT Code 559.687-014;

(iii) Surveillance System Monitor, DOT Code 379.367-010.  Id. at 51-52.

### d. Review of the ALJ's Decision

The ALJ issued his written decision on October 1, 2014.  Id. at 18-28.  The ALJ

concluded that Plaintiff "has not been under a disability within the meaning of the Social

Security Act from October 17, 2011, [the alleged disability onset date,] through the date of this decision." Id. at 18. The ALJ determined that Plaintiff's date of last insured is December 31, 2016, and that he had not engaged in substantial gainful activity. Id. at 20. The ALJ next found that Plaintiff suffered from the following severe impairments:

> [S]tatus post left knee arthroscopy and associated osteoarthritis; obesity; renal cell carcinoma and status post related nephrectomy; right hip osteoarthritis; obstructive sleep apnea; and asthma.

Id. The ALJ also found that Plaintiff suffered from the following non-severe impairments: "coronary artery disease and hypothyroidism." Id. However, the ALJ noted that the record is devoid of any medical evidence that those impairments "have had greater than a slight or minimal effect on [Plaintiff's] ability to perform basic work activities…." Id. Relatedly, the ALJ determined that Plaintiff "does not have an impairment or a combination of impairments that meets or medically equals the severity of one of the limited impairments in 20 CFR Part 404, Subpart p, Appendix 1." Id. at 21.

With respect to his residual capacity determination, the ALJ determined that Plaintiff was able to "perform sedentary work allowing him to sit or stand alternatively at will provided that he is not off task more than 5% of the work period." Id. The ALJ concluded that Plaintiff "can occasionally climb ramps and stairs," but he "can never climb ladders, ropes or scaffolds." Id. "He can only occasionally stoop, couch or kneel," but "[h]e can never crawl" or "have exposure to moving machinery, unprotected heights or driving vehicles." Id. Finally, the ALJ found that Plaintiff cannot be exposed to "extreme heat or cold, wetness or humidity and to irritants," including fumes, odors and gases. Id. at 21-22.

With respect to credibility, the ALJ concluded that Plaintiff's own testimony that "he is unable to work… is not credible because it is not supported by a record showing that[,] despite multiple physical impairments[,] he is able to function on a daily basis." Id. at 25. The ALJ

specifically reasoned that Plaintiff does not use a cane to walk, and that "he has no problems showering and he only has a problem when he must put on his shoes and socks." Id. at 22, 25. The ALJ found that Plaintiff is able to drive, but "he could not do so for long trips." Id. Indeed, the ALJ noted that Plaintiff "drove to the hearing alone." Id. Plaintiff is able to use his computer and smartphone, and "[h]e also stated that he can cook, do shopping and take out the trash… [as well as] run errands with his wife." Id. Despite complaints of significant pain, the ALJ stated that "[h]e no longer goes to physical therapy and he also went on vacation." Id. Similarly, "[h]e only sees his orthopedist every six months." Id. With regard to his weight, the ALJ reasoned that Plaintiff "currently weighs 290 pounds because he gained 60 pounds from lack of exercise." Id. And, although he has asthma and sleep apnea, Plaintiff "smokes one pack of cigarettes daily." Id.

After conducting a thorough review of the medical record, the ALJ determined that, "[s]ince nothing in the medical evidence… shows that [Plaintiff's] impairments preclude him from performing physical related work activities, [Plaintiff] is not disabled…." Id. at 25. The ALJ assigned "little weight" to Dr. DeMarco's opinion that Plaintiff is "totally disabled" and Buonviaggio's opinion that Plaintiff has a "permanent disability." Id. at 25-26. The ALJ explained that those opinions "are not supported by the physical consultative examiner and treating physician 2014 opinions that [Plaintiff] can perform sedentary exertion in addition to physical examination reports showing that [Plaintiff] has had a primarily normal gait, only somewhat limited right hip motion, cancer that was responsive to surgery, [and] left knee pain that medically improved with surgery and medication." Id. at 26.

In contrast, the ALJ gave "[g]reat weight… to the 2013 and 2014 physical consultative examiner and treating physician opinions that [Plaintiff] is capable of sedentary exertion…." Id.

The ALJ found that Plaintiff has "had medical improvements in his left knee and cancer while his most recent physical examination reports show[] that he has an essentially normal gait, only mild to moderate limited ranges of musculoskeletal motion and that he was essentially neurologically intact." Id. The ALJ specifically reasoned that Plaintiff testified that "he stopped attending physical therapy, only sees an orthopedist twice a year, [and] went on vacation after the alleged onset date…." Id.

Next, the ALJ determined that Plaintiff was not capable of performing his past relevant work as a police officer "because it is too physically demanding." Id. However, based on the testimony of Wilson, the vocational expert, the ALJ concluded that Plaintiff could perform the following jobs, which exist in significant numbers in the national economy: (i) Order Clerk, Dictionary of Occupational Titles ("DOT") Code 209.567-014; (ii) Ampoule Sealer, DOT Code 559.687-014; (iii) Surveillance System Monitor, DOT Code 379.367-010. Id. at 26-27.

## II.     STANDARD OF REVIEW

On a review of a final decision of the Commissioner of the Social Security Administration, a district court "shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); see Matthews v. Apfel, 239 F.3d 589, 592 (3d Cir. 2001). The Commissioner's decisions regarding questions of fact are deemed conclusive on a reviewing court if supported by "substantial evidence in the record." 42 U.S.C. § 405(g); see Knepp v. Apfel, 204 F.3d 78, 83 (3d Cir. 2000). While the court must examine the record in its entirety for purposes of determining whether the Commissioner's findings are supported by substantial evidence, Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978), the standard is highly deferential. Jones v. Barnhart, 364 F.3d 501, 503

(3d Cir. 2004). Indeed, "substantial evidence" is defined as "more than a mere scintilla," but less than a preponderance. McCrea v. Comm'r of Soc. Sec., 370 F.3d 357, 360 (3d Cir. 2004). "It means such relevant evidence as a reasonable mind might accept as adequate." Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999). A reviewing court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992), cert. denied, 507 U.S. 924 (1993). Accordingly, even if there is contrary evidence in the record that would justify the opposite conclusion, the Commissioner's decision will be upheld if it is supported by the evidence. See Simmonds v. Heckler, 807 F.2d 54, 58 (3d Cir. 1986).

Disability insurance benefits may not be paid under the Act unless Plaintiff first meets the statutory insured status requirements. See 42 U.S.C. § 423(c). Plaintiff must also demonstrate the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months…." 42 U.S.C. § 423(d)(1)(A); see Plummer, 186 F.3d at 427. An individual is not disabled unless "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). Eligibility for supplemental security income requires the same showing of disability. Id. at § 1382c (a)(3)(A)-(B).

The Act establishes a five-step sequential process for evaluation by the ALJ to determine whether an individual is disabled. See 20 C.F.R. § 404.1520. First, the ALJ determines whether the claimant has shown that he or she is not currently engaged in "substantial gainful activity."

Id. at § 404.1520(a); see Bowen v. Yuckert, 482 U.S. 137, 146-47 n.5 (1987). If a claimant is presently engaged in any form of substantial gainful activity, he or she is automatically denied disability benefits. See 20 C.F.R. § 404.1520(b); see also Bowen, 482 U.S. at 140. Second, the ALJ determines whether the claimant has demonstrated a "severe impairment" or "combination of impairments" that significantly limits his physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c); see Bowen, 482 U.S. at 146-47 n.5. Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b). These activities include physical functions such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling." Id. A claimant who does not have a severe impairment is not considered disabled. Id. at § 404.1520(c); see Plummer, 186 F.3d at 428.

Third, if the impairment is found to be severe, the ALJ then determines whether the impairment meets or is equal to the impairments listed in 20 C.F.R. pt. 404, subpt. P., app. 1 (the "Impairment List"). 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant demonstrates that his or her impairments are equal in severity to, or meet those on the Impairment List, the claimant has satisfied his or her burden of proof and is automatically entitled to benefits. See id. at § 404.1520(d); see also Bowen, 482 U.S. at 146-47 n.5. If the specific impairment is not listed, the ALJ will consider in his or her decision the impairment that most closely satisfies those listed for purposes of deciding whether the impairment is medically equivalent. See 20 C.F.R. § 404.1526(a). If there is more than one impairment, the ALJ then must consider whether the combination of impairments is equal to any listed impairment. Id. An impairment or combination of impairments is basically equivalent to a listed impairment if there are medical findings equal in severity to all the criteria for the one most similar. Williams, 970 F.2d at 1186.

If the claimant is not conclusively disabled under the criteria set forth in the Impairment List, step three is not satisfied, and the claimant must prove at step four whether he or she retains the "residual functional capacity" to perform his or her past relevant work. 20 C.F.R. § 404.1520(e); Bowen, 482 U.S. at 141. If the claimant is able to perform previous work, the claimant is determined to not be disabled. 20 C.F.R. §§ 404.1520(e), 416.920(e); Bowen, 482 U.S. at 141-42. The claimant bears the burden of demonstrating an inability to return to the past relevant work. Plummer, 186 F.3d at 428. Finally, if it is determined that the claimant is no longer able to perform his or her previous work, the burden of production then shifts to the Commissioner to show, at step five, that the "claimant is able to perform work available in the national economy." Bowen, 482 U.S. at 146-47 n.5; Plummer, 186 F.3d at 428. This step requires the ALJ to consider the claimant's residual functional capacity, age, education, and past work experience. 20 C.F.R. § 404.1520(f). The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether the claimant is capable of performing work and not disabled. Id.

## III.   DISCUSSION

Plaintiff presents two arguments on appeal as to why the ALJ's residual functional capacity determination at step four is unsupported by substantial evidence. First, Plaintiff contends that the ALJ failed to properly weigh the medical opinion evidence because he disregarded the opinions of Plaintiff's treating sources. Second, Plaintiff maintains that the ALJ failed to properly evaluate Plaintiff's credibility on the severity of his symptoms and resulting limitations.

### a.   **Whether the ALJ Properly Considered the Medical Opinion Evidence**

Plaintiff argues that, although the ALJ stated that he gave "great weight" to the opinions of the treating sources, such opinions clearly lead to the inevitable conclusion that Plaintiff is disabled. Plaintiff speculates that, had the ALJ actually given "great weight" to Dr. Saada's opinion that Plaintiff was only able to occasionally lift five pounds, it is improbable for the ALJ to find that Plaintiff is capable of sedentary work, which "requires lifting and carrying of up to 10 pounds in an 8 hour workday."[2] Pl.'s Br. at p. 19. Moreover, Plaintiff contends that Dr. DeMarco opined that Plaintiff is "totally disabled" because Plaintiff continues to suffer pain in his left knee and hip, and that he will eventually require knee replacement surgery. In addition, Plaintiff maintains that Buonviaggio determined that Plaintiff is "permanently disabled" because she found that he had an antalgic gait, muscle atrophy in his left quadriceps and decreased strength as a result of his knee injury and subsequent surgery.

"[I]n making a residual functional capacity determination, the ALJ must consider all evidence before him," and must "give some indication of the evidence which he rejects and his reason(s) for discounting such evidence." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000); see Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981); see also Goldberg v. Colvin, No. 13-6055, 2015 U.S. Dist. LEXIS 31012, at *24-25 (D.N.J. Mar. 13, 2015). "Where the ALJ's findings of fact are supported by substantial evidence, [district courts] are bound by those findings, even if [the courts] would have decided the factual inquiry differently." Hagans v. Comm'r of Soc. Sec., 694 F.3d 287, 292 (3rd Cir. 2012) (internal quotation marks and citation omitted).

---

[2] "Sedentary work" is defined as a job that "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. 404.1567(a). "Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." Id

Under 20 C.F.R. § 404.1527(c)(2), a treating source's opinion will be given controlling weight if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." Several factors may also be used to determine the weight given to a medical opinion including: length of treatment relationship, the nature and extent of the treatment relationship, supportability by medical evidence, and consistency with the record as a whole. Id. If a treating source's opinion conflicts with that of a non-treating source, "the ALJ may choose whom to credit but cannot reject evidence for no reason or for the wrong reasons." Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000). That is, the ALJ must rely only on "contradictory medical evidence" in rejecting the treating source's opinion, rather than "credibility judgments, speculation or lay opinion." Id. An ALJ is required to provide "an explanation of the reasoning behind [his] conclusions," including "reason(s) for discounting rejected evidence." Fargnoli v. Halter, 247 F.3d 34, 43 (3d. Cir. 2001).

In the instant matter, while Plaintiff contends that Dr. Saada's opinion leads to a finding that Plaintiff cannot satisfy the minimum lifting requirements for sedentary work, that opinion is not entitled to "controlling weight" because it is inconsistent with the medical evidence as a whole.[3] See Morales, 225 F.3d at 317; see also Plummer, 186 F.3d at 429. Instead, the ALJ concluded that Dr. Chakrabarti's consultative reports and Medical Source Statement, as well as

---

[3] In his report, Dr. Saada checked a box on the Social Security form, which stated that "[he] cannot provide a medical opinion regarding [Plaintiff's] ability to do work-related activities. A.R. at 753. However, it appears that Dr. Saada mistakenly check that box because he specifically provided his opinion on Plaintiff's functional limitations. In addition, the ALJ considered Dr. Saada's opinions in his decision. Thus, the Court will assume that Dr. Saada intended to render a medical opinion on Plaintiff's residual functional capacity.

Plaintiff's own testimony, support the finding that Plaintiff is capable of "sedentary exertion," which includes the ability to lift up to ten pounds throughout the workday. A.R. at 26.

In particular, the ALJ concluded that "[the] most recent physical examination reports show[] that [Plaintiff] has an essentially normal gait, only mild to moderately limited ranges of musculoskeletal motion and that he was essentially neurologically intact." Id. The ALJ reasoned that Dr. Chakrabarti concluded, in his 2013 report, that "[Plaintiff] had a minimal limp; and he was able to partially squat with help." Id. at 24. The ALJ stated that "Dr. Chakrabarti [] wrote that [Plaintiff's] right knee flexion was 110/120 degrees; his left knee flexion was 90/120; his bilateral hip flexion was 100 degrees on both side… [and] he had only minimally positive straight leg raising." Id. Moreover, the ALJ explained that Dr. Chakrabarti concluded, in his 2014 report, that Plaintiff was able to perform many of the activities of daily living, and that "his right knee flexion and extension was 120 degrees; his left knee flexion and extension was 100 degrees; his left side hip flexion was 100 degrees; [and] his right side hip flexion was 90 degrees…." Id. Also relying on the Medical Source Statement, the ALJ determined that "Dr. Chakrabarti opined that in an 8 hour workday [Plaintiff] could lift and carry up to 10 pounds; sit for 4 hours; stand and/or walk for 2 hours; occasionally climb ramps and stairs; occasionally crouch; an never perform any other postural functions." Id.

In addition to the medical evidence, the ALJ found that Plaintiff's own testimony indicates that "his impairments have improved and stabilized," and thus, Plaintiff is capable of sedentary work. Id. at 25-26. The ALJ noted that, "[d]espite his history of degenerative joint disease in his knee, [Plaintiff] has been able to ambulate effectively without the use of an assistive device," such as a cane. Id. at 22. The ALJ reasoned that "[Plaintiff] can cook, do shopping and take out the trash while he also can run errands with his wife." Id. Similarly, the

ALJ determined that Plaintiff has "stopped attending physical therapy, only sees an orthopedist twice a year, [and] went on vacation after the alleged onset date…." Id. at 26.

In addition, Plaintiff argues that the ALJ improperly assigned "little weight" to Dr. DeMarco's opinion that Plaintiff is "totally disabled" and Buonviaggio's opinion that Plaintiff is "permanent[ly] disabled." Id. at 25. However, the Third Circuit has recognized that "a treating source's opinion about a claimant's ability to work is not entitled to special deference; the disability determination is the province of the [Commissioner] alone." Dula v. Barnhart, 129 Fed. Appx. 715, 719 n.3 (3d Cir. 2005). Indeed, the ALJ concluded that those opinions are not supported by the medical evidence – specifically that Plaintiff "has had a primarily normal gait, only somewhat limited right hip motion, cancer that was responsive to surgery, left knee pain that medically improved with surgery and medication." A.R. at 26.

Accordingly, the Court concludes that the ALJ's determination that Plaintiff possessed the residual functional capacity to perform sedentary work is supported by substantial evidence. Dr. Saada's opinion that Plaintiff can only occasionally lift five pounds conflicts with Dr. Chakrabarti's opinions that Plaintiff is capable of limited work, including lifting up to ten pounds. Similarly, Dr. Chakrabarti's opinions contradict the opinions of both Dr. DeMarco and Buonviaggio that Plaintiff was "disabled." Based on those inconsistences, the ALJ was allowed to credit Dr. Chakrabarti's opinions and reports, along with the evidence in the record as a whole. Relying on objective medical evidence, as well as Plaintiff's own testimony, the ALJ properly concluded that Plaintiff has experienced a gradual improvement in connection with his limitations, especially his knee and hip impairments, and that Plaintiff has generally stabilized since his surgeries. Additionally, the ALJ provided adequate explanation as to why Plaintiff maintains some residual functional capacity.

**b.      Whether the ALJ Properly Evaluated Plaintiff's Credibility**

Plaintiff argues that the ALJ improperly discounted his subjective complaints. Credibility determinations are entitled to substantial deference on appeal. See Reefer v. Barnhart, 326 F.3d 376, 380 (3d Cir. 2003) (stating that courts "ordinarily defer to an ALJ's credibility determination because he or she has the opportunity at a hearing to assess a witness's demeanor."); see also Izzo v. Comm'r of Soc. Sec., 186 Fed. Appx. 280, 286 (3d Cir. 2006) (stating that "a reviewing court typically defers to an ALJ's credibility determination so long as there is a sufficient basis for the ALJ's decision to discredit a witness."). When making credibility determinations, the ALJ must consider "all [the] symptoms, including pain, and the extent to which [the] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(a); see Hartranft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999) ("Allegations of pain and other subjective symptoms must be supported by objective medical evidence."). Rejection of subjective testimony must be based on substantial evidence. See VanHorn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983).

Here, the ALJ concluded that Plaintiff's own testimony that "he is unable to work… is not credible because it is not supported by a record showing that[,] despite multiple physical impairments[,] he is able to function on a daily basis." A.R. at 22, 25. Although Plaintiff testified that he is in constant pain and unable to work, the ALJ reasoned that Plaintiff does not use a cane to walk, and is still able to perform most activities of daily living, such as cooking and doing chores around the house. Id. The ALJ found that Plaintiff still uses his computer and a smartphone, and is capable of driving a car, especially considering the fact that he drove to the hearing. Id. Despite complaints of pain, the ALJ stated that Plaintiff stopped going to physical therapy, and he only sees his orthopedist every six months. Id. He also went on a vacation to St.

Martin after his alleged onset date.  Id.  Finally, the ALJ reasoned that Plaintiff "currently weighs 290 pounds because he gained 60 pounds from lack of exercise."  Id.  And, although he has asthma and sleep apnea, Plaintiff "smokes one pack of cigarettes daily."  Id.  Thus, the ALJ thoroughly considered Plaintiff's subjective complaints in reaching the residual functional capacity determination and, based on the record, the ALJ's rejection of Plaintiff's subjective complaints of pain and his inability to work is supported by substantial evidence in the record.

Additionally, Plaintiff argues that the ALJ should have considered his long work history with the NYPD when assessing his credibility.  However, that argument is misplaced.  Although the Third Circuit has stated that, for a claimant with a long work history, "testimony as to his capabilities is entitled to substantial credibility," such testimony must be "supported by competent medical evidence."  Dobrowolsky v. Califano, 606 F.2d 403, 409 (3d Cir. 1979).  Here, the ALJ did not entirely discredit Plaintiff's own testimony.  To the contrary, he concluded that Plaintiff's testimony was "credible to the extent that it is supported by a record showing that all of his impairments have improved or stabilized."  Id. at 25.  However, the ALJ found that portions of Plaintiff's testimony were not supported by the objective medical evidence, specifically "[Plaintiff's] testimony that he is unable to work."  As discussed supra, the ALJ's conclusion is supported by the evidence in the record as a whole.  Thus, this Court cannot substitute its opinion for that of the ALJ.

Therefore, this Court accords great deference to the ALJ's credibility determination of Plaintiff's subjective testimony and finds the ALJ's decision in that regard is supported by substantial evidence.  See, e.g., Malloy v. Comm'r of Soc. Sec., 306 Fed. Appx. 761, 765 (3d Cir. 2009) ("Credibility determinations as to a claimant's testimony regarding pain and other subjective complaints are for the ALJ to make.  In view of the evidence presented in the record

and of the ALJ's 'opportunity to observe the demeanor and to determine the credibility of the claimant,' these findings are entitled to 'great weight' and should be upheld.") (citation omitted).

## IV.     CONLCUSION

For the reasons set forth above, the Court finds that the ALJ's decision is supported by substantial evidence in the record.  Accordingly, the ALJ's decision is affirmed, and Plaintiff's Complaint is dismissed.

DATE: May 9, 2017                                    /s/ Freda L. Wolfson
                                                     The Honorable Freda L. Wolfson
                                                     United States District Judge